UNITED FRUIT COMPANY, a corporation, as owner of the S.S. METAPAN, Libellant,

v.

PANAMA CANAL COMPANY, a corporation, Respondent.

No. 5598.

District Court, Canal Zone, Division Balboa.

July 28, 1965.

L. S. Carrington, R. Phillipps, Balboa, Canal Zone, for libelant.

David J. Markun, Jerry W. Mitchell, Gen. Counsel, Balboa Heights, Canal Zone, for respondent.

CROWE, District Judge.

### STATEMENT OF THE CASE

This is an admiralty action by the United Fruit Company, a corporation existing under and by virtue of the laws of the State of New Jersey, owner of the S. S. METAPAN, for damages alleged to have been suffered by the vessel when she came into contact with the south center wall of Gatun Locks on or about November 22, 1961 while departing from the said locks. The action was brought under Section 10, Title 2 of the Canal Zone Code, as amended June 13, 1940, Chapter 358, Section 1, 54 Stat. 387; September 26, 1950, Chapter 1049, Section 3, 64 Stat. 1039 (now covered by Title 2, Canal Zone Code, Section 292, 76A Stat. 23.) The libelant claims damages in the amount of $13,600.00, plus interest and costs.

### FINDINGS OF FACT

1. The S. S. METAPAN is a twin screw, steam turbine cargo vessel, 455 feet long, 61 feet in beam, and of 7,067 gross tons, which at all times relevant herein was owned and operated under United States registry by libelant, United Fruit Company. Her mean authorized tropical fresh water draft was 27 feet 7¾ inches, and on November 22, 1961, she was lightly laden with a fresh water draft of 15 feet 3 inches forward and 22 feet aft. She was built in 1947 by the Newport News Shipbuilding and Dry Dock Company, Newport News, Virginia.

2. On the afternoon of 22 November 1961 the S. S. METAPAN was boarded by Panama Canal pilot William M. Deaton at approximately 1600 hours while she lay at anchor in Limon Bay. He was assigned as transit pilot of the vessel to control her navigation and movements in accordance with the provisions of 35 CFR 4.27.

3. She was designated as schedule South 11, the first vessel of a tandem schedule. With pilot Deaton at the conn she commenced heaving her anchor at approximately 1630 hours for transit of the Panama Canal. Her transit through Gatun Locks was normal in all respects until she was departing from the upper west chamber at the south end of Gatun Locks.

4. With the lock chamber full and the gates open she proceeded out of the chamber under tow of the locomotives. She was centered in the chamber when the lead locomotives reached the knuckle. At that time her engines were ordered half ahead and the signal to release the locomotive wires was sounded by the pilot.

5. Immediately upon the sounding of the signal to release the locomotive wires all of said wires were promptly released and at about 1921 hours, were all clear with the exception of the wire running from the vessel's starboard quarter to the stern wing wall locomotive.

6. The starboard quarter wire was delayed in release due to a sudden and unpredictable kinking of the wire on the locomotive drum which prevented the locomotive operator from giving sufficient slack for the wire to be thrown off the vessel.

7. When the locomotive operator discovered that the wire had apparently kinked on the locomotive drum, he slowed his locomotive so that the S. S. META-PAN would pull his wire out.

8. The delay in releasing the starboard quarter wire caused the vessel to take a sudden sheer to port.

9. When the starboard quarter locomotive wire hung up, the pilot instantly gave appropriate helm and engine orders so as to keep the starboard quarter off the wing wall. He gave full ahead on the port engine followed by full astern on the starboard engine, both recorded in the vessel's bell book as being given at 1921 hours, the time when the locomotive wire hung up.

10. The starboard quarter wire was released at approximately 1922 hours, at which time the pilot gave full ahead on the starboard engine and appropriate helm orders in attempting to steady the vessel.

11. The starboard quarter wire was delayed about one minute in being released.

12. Shortly after the starboard quarter wire was released, the port propeller guard came close to the center wall, climbed the inclined portion of the wall, and rode along the incline for approximately ten feet before falling off and moving away from the center wall.

13. The S. S. METAPAN moved approximately 450 feet ahead from the point where the last wire was let go to the point where her port propeller guard overrode the center wall incline.

14. There were no locomotive wires attached to the S. S. METAPAN at the time her port propeller guard overrode the center wall incline.

15. At the time of the overriding the wind was blowing from the west across the S. S. METAPAN, from starboard to port, at a right angle to her heading at a velocity of approximately 15 to 20 knots. The wind may have had an appreciable effect on the accident.

16. The master of the S. S. METAPAN made no criticism of the manner in which the pilot handled the vessel.

17. The pilot made no criticism of the manner in which the master and crew performed their duties.

18. The master of the S. S. METAPAN testified that her propeller guards stick out beyond her normal side and that they are plainly visible from the wing of her bridge.

19. Using a perpendicular at the outer edge of the port propeller guard, said guard protrudes two feet, seven and one-half inches, (2′ 7½″) beyond the outer edge of the shell plating or skin of the vessel at the upper or weather deck and approximately eight feet, three inches (8′ 3″) beyond the outer edge of the shell plating or skin of the vessel at the main deck.

20. The port propeller guard does not protrude beyond a line drawn along the flat side of the vessel amidships, parallel to the vessel's keel.

21. When the port propeller guard of the S. S. METAPAN overrode the center wall incline of Gatun Locks, the port propeller guard and certain areas of the vessel's hull were injured when the propeller guard was pushed up approximately two feet. The injuries to the vessel's hull occurred at the points where said propeller guard was attached to the hull. This injury to the hull is a direct and proximate result of the concentration of the force, exerted by the vessel's weight when the port propeller guard overrode the inclined portion of the center wall, upon the small area represented by the protrusion of the propeller guard beyond the side of the vessel. There was no damage to the port propeller of the S. S. METAPAN.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction over the parties and the subject matter of the action.

2. At the time of the accident, Panama Canal pilot Deaton was in control of the navigation and movements of the S. S. METAPAN pursuant to the provisions of 35 CFR 4.27.

3. The injuries caused to the S. S. METAPAN when her port propeller guard overrode the inclined portion of the center wall at Gatun Locks on November 22, 1961, occurred by reason of her passage through the locks of the Panama Canal under the control of offi-

cers or employees of the Panama Canal Company within the meaning of Section 10(a) of Title 2 of the 1934 Canal Zone Code, as amended. (Now Title 2, Canal Zone Code, Section 291. 76A Stat. 23).

4. The proximate cause of the accident was the failure of the wires from the starboard quarter locomotive to be released promptly, when the vessel sounded a signal for all wires to be cast off, thereby causing the ship to take a sudden sheer.

■■■ 5. "Protrusion beyond the side of a vessel" as stated in the statute means anything which extends or protrudes beyond the amidships section of the ship. The entire hull of the vessel cannot be considered as the "side" within the meaning of the statute. Such a holding would exclude recovery for damages to the propeller, the blades of which always extend beyond the skin or hull of the ship as it narrows toward the keel. The "side" in contemplation, therefore, must be the beam ends and perpendiculars extending therefrom fore and aft and up and down.

■■■ 6. The port propeller guard of the S. S. METAPAN does not protrude beyond the side of the ship as contemplated by the statute.

■■■ 7. There was no negligence or fault on the part of the vessel, master or crew, or any contributory negligence or fault on the part of the vessel, master or crew.

8. Respondent, the Panama Canal Company, is liable for the injury and damages to the S. S. METAPAN on the day alleged in the libel.

The Pretrial Conference Order does not reveal whether or not further proof will be submitted for the determination of the damages, and the case is therefore continued for further orders as to the procedure to be followed on this point.

The clerk will not prepare a judgment until the question of damages is determined.